UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAMARIS JUSTINIANO, as the Personal Representative of the Estate of WILFREDO JUSTINIANO, JR.,<br><br>Plaintiff,<br>v.<br><br>STEPHEN WALKER, and TIMOTHY P. ALBEN,<br><br>Defendants. | C.A. NO.: 1:15–cv–11587–NMG<br><br>Case assigned to:<br>Honorable Nathaniel M. Gorton<br><br>Motion referred to:<br>Magistrate Donald L. Cabell |

**OPPOSITION TO DEFENDANT TIMOTHY P. ALBEN'S MOTION TO DISMISS COUNTS THREE AND FOUR OF PLAINTIFF'S COMPLAINT**

This case arises amidst growing, national concern over the frequency that police use unconstitutional levels of force, too often resulting in death, on unarmed civilians who have not broken the law. While much of the high-profile media attention focuses on cases where the use of force appears racially motivated, other cases—including this one—concern police interactions with the mentally ill. These cases are troubling because, quite often, the techniques used by officers to assert control over the situation have the opposite effect, escalating the situation to the point that death can result. Indeed, in many of these cases, the citizen was unarmed and no crime was committed.

The problem is particularly acute given the deinstitutionalization of the past two decades. The systematic shuttering of state mental hospitals means that people with severe mental illness "have come into contact with the criminal justice system more so

now than ever before, further adding to the mental health crisis our nation faces today by catapulting the number of mentally ill persons in our prisons and jails and contributing to rising healthcare costs." (Exhibit A, at 1.) If it was wrong to consign people to "pig pens" solely by reason of their mentally illness, as Judge Joseph L. Tauro found in 1977,[1] it is equally wrong now to consign those same people to coffins thirty-six years later, simply because of the Massachusetts State Police's recalcitrance in adopting crisis intervention techniques that thousands of police departments across the country now recognize as being necessary.

## FACTS

On June 14, 2013, Wilfredo Justiniano pulled his small black car to the side of Route 28. (Compl., ¶ 11.) A witness had observed Wilfredo Justiniano's driving erratically and dialed 911. *Id.* The witness at first thought Wilfredo was having a heart attack, but, upon approaching his vehicle, observed that he appeared distraught. (Compl., ¶ 12.) The witness neither observed any criminal acts nor did she report any criminal acts. (Compl., ¶¶ 1, 10–14.)

The State Police dispatched Trooper Stephen Walker as the first responder, even thought he was untrained in assisting citizens suffering a mental health crisis. (Compl., ¶¶ 13, 58, 59, 62–64.) When he arrived on the scene, Defendant Walker made a similar observation as the 911 caller that Wilfredo seemed distraught. (Compl., ¶ 14.) Trooper Walker immediately had a "bad feeling" about the situation and called for backup. (Compl., ¶ 14.)

---

[1] *Ricci v. Callahan*, 576 F. Supp. 415, 417 (D. Mass. 1983).

But for unknown reasons, Defendant Walker did not wait for backup. (Compl., ¶ 15.) Instead—and despite his "bad feeling"—Trooper Walker emerged from his cruiser and approached the distraught Wilfredo Justiniano. (Compl., ¶ 15.) The reason why Trooper Walker decided to engage Wilfredo Justiniano did not involve any apparent law enforcement purpose. At that point, Trooper Walker had not seen any weapons. (Compl., ¶ 16.) In fact, Wilfredo Justiniano was unarmed. *Id.* Nor did Trooper Walker suspect any criminal activity had taken place or was about to take place. In fact, Wilfredo Justiniano had not committed a crime. (Compl., ¶ 17.) Nor was Wilfredo Justiniano posing a danger to the public or to Trooper Walker. (Compl., ¶¶ 18–19.) Indeed, the 911 caller, who had pulled her van to the side of the road just in front of Wilfredo Justiniano's car, could have driven away if she felt unsafe but remained in the area until first responders arrived. (Compl., ¶ 13.)

Upon making first contact with Wilfredo Justiniano, Defendant Walker was immediately alerted to the fact that Wilfredo Justiniano was having a mental health crisis. Wilfredo Justiniano told Trooper Walker that he (Wilfredo Justiniano) was an undercover cop and that Trooper Walker needed to kill him for that reason. (Compl., ¶ 20.) Wilfredo Justiniano then approached Trooper Walker. (Compl., ¶ 21.)

Like all members of the State Police, Trooper Walker has had no training on how to de-escalate a mental health crisis. (Compl., ¶ 59.) Instead—and acting in conformity with his training—Trooper Walker treated Wilfredo as a criminal and escalated the conflict. (Compl., ¶ 1.) Armed only with pepper spray and a gun, Trooper Walker first reached for his pepper spray, spraying Wilfredo Justiniano in the face twice in an effort

to subdue him. (Compl., ¶ 21.) Pepper spray is only useful, however, when a rational subject is uncooperative but not assaultive; it is not useful to de-escalate a mental health crisis or a situation once someone has become assaultive. (Compl., ¶¶ 59–60.) But Trooper Walker had not received any training on mental health crises and perhaps was caught off guard when the pepper spray did not force Wilfredo Justiniano into submission. (Compl., ¶ 21.) After the first spray was unsuccessful, Trooper Walker decided to spray again, this time at such close range that the pepper spray splashed off of Wilfredo Justiniano's face and sprayed back into Trooper Walker's eyes. (Compl., ¶ 21–22.) At this point, Trooper Walker felt vulnerable because his vision was "jeopardized." (Compl., ¶ 22.) He then began backing away from Wilfredo Justiniano. *Id.* But rather than maintaining distance, Defendant Walker drew his gun and "double tapped," shooting Wilfredo Justiniano twice. *Id.* The first bullet passed through Wilfredo Justiniano and was never recovered. (Compl., ¶ 23.) The second shot hit Wilfredo Justiniano in the chest, causing massive internal injuries. (Compl., ¶ 24.)

After being shot, Wilfredo Justiniano fell to his knees and then to ground, his breathing labored. (Compl., ¶¶ 25–27.) As Wilfredo Justiniano attempted to stand up, Trooper Walker kicked him back to the ground. (Compl., ¶ 28.) When backup finally arrived, troopers struggled to handcuff Wilfredo Justiniano, who at this point was lying face down. During the struggle, Wilfredo Justiniano was pepper-sprayed in the face a third time. (Compl., ¶ 30.) Wilfredo Justiniano was taken to a nearby hospital and was declared dead later that morning. (Compl., ¶ 32.)

In an interview shortly Wilfredo Justiniano's death, Defendant Alben admitted the State Police's lack of training on mental health encounters, stating: "in terms of negotiating with someone with mental health [issues], there is not a great deal of training in law enforcement. If there is a shortcoming in any system, it's the fact that there aren't those kinds of resources devoted to training." (Compl., ¶ 66.)

The Complaint alleges that there is a "well-documented" increase in the number of mental health crises and a "corresponding increase in the number of tragic encounters with police where unarmed mentally ill citizens end up dead." (Compl., ¶ 77.) The Complaint alleges that Defendant Alben has been aware of the trend of increasing confrontations between police and the mentally ill resulting in a deprivation of the mentally ill citizen's constitutional rights, but he has taken no action within the State Police to prevent such deprivations. (Compl., ¶ 79.)

Faced with the same trend, other police departments around the country have instituted training on how to deal with mentally ill citizens. (Compl. ¶ 78.). Such training includes "teaching officers to defuse potentially volatile situations and to treat people who suffer from mental illnesses with respect." *Id.* This type of training also seeks to prevent police officers from making a mental health crisis worse by trying to force compliance or reacting with fear, *i.e.* the approach advocated by traditional training when dealing with a criminal. *Id.* Indeed, the "traditional training results in an escalation of force where the subject is uncooperative (or inattentive) to verbal commands, appears defiant or aggressive, reacts combatively to attempts to restrain or subdue, and is not rationally dissuaded by a demonstration of superior force. Such

traits are hallmarks of the mentally ill." Wilfredo Justiniano, who had a history of mental illness and was a diagnosed schizophrenic, bore all of these hallmarks.

## ARGUMENT

Since 1988, the increasing number of collisions between the mentally ill and law enforcement caused by deinstitutionalization has led to the concomitant spread of law enforcement techniques to address the unique challenges presented by the mental ill. The most important technique has been the development of crisis intervention teams (CIT) and the adoption of CIT training and policies—a formal movement that began in 1988 in response to a tragic shooting of a mentally ill man in Memphis the prior year. (Exhibit B; Exhibit C, at 13.) By 2012, more than 2,000 state and local police departments have adopted some form of CIT training. (Exhibit C, at 15.) This includes Portland, OR and Albuquerque, NM, which were forced to adopt CIT training as part of consent decrees entered into with the U.S. Department of Justice's Civil Rights Division. (Exhibits D & E.) The advantages of CIT programs include reduced injuries, reduced use of force, and lower arrest rates. (Exhibit B, at 6.)

The national movement to adopt such measures appears to have bypassed the Massachusetts State Police, at least under Defendant Alben's tenure. Under Defendant Alben's supervision, the Massachusetts State Police provided no CIT training to troopers. Nor did the Massachusetts State Police provide equipment, policies, or any other tools designed to de-escalate conflicts with the mentally ill or to provide accountability to ensure that the State Police operate within the bounds of the constitution.

### A. Defendant Alben Acted With "Deliberate Indifference" by His Utter Failure to Provide the Training Necessary to Avoid Fatal Shootings of the Mentally Ill Who Were Not Engaging in Criminal Activity

A supervisor "may be liable under section 1983 if he formulates a policy or engages in a practice that leads to a civil rights violation committed by another." *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6–7 (1st Cir. 1998); *see also City of Canton v. Harris*, 489 U.S. 378, 388–89, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). If liability is based on unwritten or informal policies, it must result from the supervisor's "deliberate choice to follow a course of action." *Britton v. Maloney*, 901 F. Supp. 444, 449 (D. Mass. 1995) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)).

Here, Defendant Alben was the policymaker for the Massachusetts State Police at the time that Wilfredo Justiniano was killed, and he had the authority to determine whether Massachusetts State Police troopers engaged non-criminal citizens who were in the midst of a mental health crisis. Plaintiff alleges that Defendant Alben was aware that state troopers under his command would need proper training on mental health issues, just as thousands police agencies across the United States have undertaken, but chose to do nothing. Defendant Alben's deliberate decision to sit idly by, in the face of known and increasing frequent tragedies when police interact with the mentally ill citizens without the necessary training to avoid violent confrontations, was no less than an authorization of a policy to provoke such encounters, resulting in constitutional deprivations and—more bluntly—the unnecessary death of citizens.

### 1. To Sufficiently Plead "Deliberate Indifference," All that Is Required Is Direct Evidence of Inadequate Training and a Need For Training that Is "So Obvious" that the Inadequacy Is Likely to Result in the Violation of Constitutional Rights

To survive a Rule 12(b)(6) motion to dismiss, a § 1983 claim against a municipality for failure to train police officers must assert a "sufficient basis for concluding that [city] policymakers reasonably should have anticipated that [the] police would need specialized instruction" in the activity. *Matalon v. City of Boston*, 2013 U.S. Dist. LEXIS 182710, *12 (D. Mass. Oct. 30, 2013).

This conclusion springs directly from the Supreme Court's decision in *City of Canton v. Harris*, 489 U.S. 378 (1989). There, the Supreme Court found that a § 1983 plaintiff can prevail on a failure-to-train theory if he can show that "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.*, at 388. In reaching this conclusion, the Supreme Court was careful to delineate between cases where the policies are the "moving force" behind the constitutional violation versus those predicated purely on *respondeat superior*. *Id.*, at 389. To be liable, policymakers must make "a deliberate choice" to follow a course of action from among "various alternatives." *Id.*

The policy choices involved in *City of Canton* concerned whether "special training (beyond first-aid training)" should be provided to determine whether a person in police custody was in need of medical care. *Id.*, at 382. The plaintiff had been denied medical care after being found and in stupor and responding to the question of whether she needed medical attention with an "incoherent remark." *Id.*, at 381. While the dissent

argued that "the diagnosis of mental illness is not one of the 'usual and recurring situations with which [the police] must deal,'" *Id.*, at 397, the majority refused to adopt that position.[2] Instead, the majority left open the possibility that a failure to train on mental illness could constitute deliberate indifference:

> But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Id.*, at 397. By way of example, the majority expounded that "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, *see Tennessee v. Garner*, 471 U.S. 1 (1985), can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton v. Harris*, 489 U.S. at 390 n.10.

Defendant Alben argues that deliberate indifference can only be imputed where there is a "pattern" of constitutional violations, but courts have stopped short of drawing such a bright line. Indeed, the Supreme Court has left open "a narrow range of circumstances" where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle

[2] While the decision in *City of Canton* occurred more than one year after the Memphis death that sparked national movement towards crisis intervention team (CIT) training, the alleged constitutional deprivation occurred in 1978, a full decade before any national recognition that policies needed to be changed.

recurring situations." *Bd. of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997).

As the Tenth Circuit observed, the Supreme Court's holding in *City of Canton* did not require evidence of more than one incident to establish a policy of inadequate training and resulting constitutional deprivation. *See Allen v. Muskogee*, 119 F.3d 837, 844–45 (10th Cir. 1997). Rather, courts "simply require evidence in addition to the occurrence of a single incident." *Id.*, at 845. Thus a plaintiff can properly rely on a single incident where, as here, there is other evidence of inadequate training. *Id.* The Tenth Circuit held that by providing "direct evidence of inadequate training," plaintiff provided sufficient evidence beyond the occurrence of the single incident to withstand summary judgment. *Id.* As with *City of Canton*, the plaintiff in *Allen v. Muskogee* claimed constitutional injury based on a lack of mental health training. *Id.*, at 842. There, police responded to a 911 call involving a man threatening suicide. *Id.*, at 839. Ninety-seconds later, the man was dead, having been shot by police who attempted to disarm him. *Id.* The plaintiff adduced evidence that such efforts were reckless and "out of synch with the entire United States in terms of what police are being trained to do." *Id.*, at 843. Almost a decade after the tragedy in Memphis, the Tenth Circuit agreed.

But even if a pattern or practice were required, no set number of incidents is required. *See Young v. City of Providence*, 404 F.3d 4, 28 (1st Cir. 2005); *United States v. W. Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971) ("The number of [violations] . . . is not determinative … In any event, no mathematical formula is workable, nor was any intended. Each case must turn on its own facts"). Nor is statistical evidence required.

*See Catlett v. Mo. Highway & Transp. Comm'n*, 828 F.2d 1260, 1265 (8th Cir. 1987), citing *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307–08, 97 S. Ct. 2736, 2741 (1977) and *Briggs v. Anderson*, 796 F.2d 1009, 1019 (8th Cir. 1986) (noting that "statistical evidence is not essential in proving" pattern or practice Title VII claim," and anecdotal evidence may be relied upon)).

It is not the number of incidents that is controlling—it is the structural factors that make such tragedies inevitable. As the U.S. Justice Department's Civil Rights Division noted in its September 2012 report finding a pattern or practice of excessive force used against people with mental health problems by the Portland (Oregon) Police Department, "the use of force is an essential part of law enforcement; however, it must be guided by policy and limited by the protections of the United States Constitution." (Exhibit D, at 2.) In its report, the DOJ concluded that the Portland Police Department's encounters with "persons with mental illness too frequently result in a use of force when force is unnecessary or in the use of a higher level of force than necessary or appropriate, up to and including deadly force." *Id.* This included "dangerous uses of force against persons who posed little or no threat and who could not, as a result of their mental illness, comply with officers' commands." *Id.* The DOJ also found "practices that escalate the use of force where there were clear earlier junctures when the force could have been avoided or minimized." *Id.* The DOJ also found that "in many other instances officers escalate conflict despite the opportunity to de-escalate; rush in when they have the option of holding back; and continue to use force once the need for force has dissipated." *Id.*, at 12. According to the DOJ, Portland's pattern of excessive

force was caused by "systemic deficiencies," most notably "the absence of officers specially trained in and proficient at responding to mental health crisis." *Id.* at 19. These are the same systemic deficiencies alleged against the Massachusetts State Police.

Defendant Alben incorrectly argues that there must be allegations of a subjective state of mind to cause the constitutional deprivation, but this argument primarily relies on Eighth Amendment cases that employ a different standard and are inapplicable. *See Jones v. Han*, 993 F. Supp. 2d 57, 68-69 (D. Mass. 2014) (distinguishing *Snell v. Demello*, 44 F. Supp. 2d 386 (D. Mass. 1999), and finding that the "subjective belief" standard from *Snell* originated in the Supreme Court's Eighth Amendment analysis in *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

In this case, it is sufficient for the Plaintiff to show direct evidence of non-existent mental health training and a need for such training that was "so obvious" by 2013 that one can infer deliberate indifference from the failure to provide the training. As set forth below, Plaintiff's allegations meet this burden.

**2. Defendant Alben Knew that Troopers Would Encounter the Mentally Ill Without Any Training**

Drawing all inferences in the Plaintiff's favor, as this Court must do on a motion to dismiss, Plaintiff has alleged that Defendant Alben knew could have anticipated and probably knew to a "moral certainty" that his officers would engage unarmed citizens suffering from mental illness who had not broken the law. Indeed, the only reasonable inference is that the Massachusetts State Police have accepted this reality by dispatching troopers to 911 calls involving medical emergencies, where no weapon, no threat, and

no crime are alleged. If the State Police did not want to accept such responsibility, they should not have accepted such assignments.

But evidently the State Police have accepted such a responsibility, and thus it follows that the necessary prerequisite for handling medical and psychiatric crises is a modicum of specialized intervention to avoid the dire consequences that by June 2013 were well known. If, for example, Defendant Alben's State Police chose to be first responders for 911 calls involving grease fires in restaurant kitchens, would troopers need any additional training, or would it be acceptable for them to simply follow their lay instincts and attempt to douse the grease fire with water?[3] Would it matter if Defendant Alben was not aware of prior instances where troopers had made grease fires worse by dousing them with water?

Defendant Alben contends that the Complaint "fails to put forth facts indicating any problem with the training policies and procedures…at the time of Mr. Justiniano's death," but this is claim is based on re-characterization of allegations against him so as to minimize his liability. *See Limone v. Condon*, 372 F.3d 39, 46 (1st Cir. 2004). Defendants are not permitted to "hijack" a plaintiff's complaint in such manner. *Id.*

Here, the Complaint alleges that shortly after Wilfredo Justiniano was shot and killed by a trooper, Defendant Alben stated that "in terms of negotiating with someone with mental health [issues], there is not a great deal of training in law enforcement." (Compl., ¶ 66.) To the extent this statement was mean to suggest empirically that there

---

[3] Rocky Mountain Fire District, Kitchen Grease Fire, http://www.rockymountainfire.org/howdoi/kitchen.htm (last accessed November 12, 2015) ("Extinguishing a Grease Fire…1. DO NOT USE WATER ON A GREASE FIRE!").

are no training methods to deal with the mentally ill anywhere in the United States, this statement was false. (Exhibits B & C.) But to the extent the statement revealed that the Massachusetts State Police do not have "a great deal of training" on mental health, it is a telling admission that Defendant Alben chose not to adopt modern de-escalation techniques. Either way, Defendant Alben's statement supports the reasonable inference of willful blindness to the need to train his troopers properly.

Plaintiff will need discovery to determine to the full extent of Defendant Alben's knowledge. That is because, like most police departments, the Massachusetts State Police does not make data concerning its shootings publicly available. Nor are cruisers fitted with cameras such that the prosecutors, defense attorneys, and members of the general public could evaluate specific instances of use of force and determine whether the force was excessive and the training appropriate. Defendant Alben misconstrues Plaintiff's allegations concerning the lack of "dash cams" as a free-standing claim for relief. Plaintiff does not allege that the failure to install cameras in and of itself is a constitutional violation. Instead, the Plaintiff alleges that the failure to have cameras is further evidence of an affirmative policy to avoid properly training officers with respect to the mentally ill. As the DOJ found in its Portland report, many cases reviewed "lacked even the fundamental elements to collect even basic acceptable force investigative data to allow management to adequately critique force incidents." (Exhibit D, at 25.) Such data would "instill public confidence and faith in those sworn to protect the law," "protect the officers and their agency from frivolous complaints," and ensure that appropriate practices are being following. *Id.*, at 25–26. If the Massachusetts State

Police wanted to demonstrate the priority it placed on the constitutional rights of the mentally ill (and protection of its officers), it would insist on the installation of dash cams in every cruiser. But it has never done so, and the failure to properly equip state police troopers, either with adequate training or adequate equipment to improve and monitor the constitutionality of its encounters with the mentally ill, supports an inference of deliberate indifference.

Here, Defendant Alben should have reasonably anticipated that by engaging with citizens in emergency mental health situations that are not of a criminal nature, that the police officers involved would need specialized training to avoid severe and unwarranted consequences. Without such specialized training, troopers will predictably follow their rote techniques of escalation, which will predictably result in violence, injury, and death. In the age of deinstitutionalization, by choosing to intervene in mental health crises involving our society's most vulnerable members—when they are at their most vulnerable and potentially volatile—the State Police has presented itself with a policy choice. Either provide de-escalation training, or continue committing constitutional deprivations akin to throwing water on grease fires. Plaintiff alleges that Defendant Alben has opted for the latter, thus making his deliberate indifference actionable.

### B. Defendant Alben Is Not Entitled to Qualified Immunity Because By 2013, the Right to Life and the Right to Be Free of Excessive Force Have Become Clearly Established, Even for Unarmed, Non-Criminal Citizens Suffering a Mental Health Crisis

Defendant Alben argues that he is protected by qualified immunity because the First Circuit has not revisited the issue of mental health policing since 1994. This is both convenient—the Memphis training was barely six years old at the time of the decision in *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87 (1st Cir. 1994)—and incorrect. As the Supreme Court noted in *Anderson v. Creighton*, it is not a requirement that the "very action in question has previously been held unlawful." 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987). Rather it is sufficient that "in the light of preexisting law, the unlawfulness must be apparent." *Id.*

It has long been established that the constitution does not permit the use of deadly force against a person who poses no immediate threat to the officer and no threat to others, even if he is a fleeing felony suspect. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985). In 2001, the Ninth Circuit extended this notion to the mentally ill who are unarmed and have committed no serious offense:

> Every police officer should know that it is objectively unreasonable to shoot -- even with lead shot wrapped in a cloth case -- an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals.

*Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001).

Defendant Alben's reliance on the *Febus-Rodriguez* to negate the apparent unlawfulness of shooting unarmed people who are mentally ill is unavailing for several reasons. First, the decision arose on appeal after a denial of summary judgment, not a motion to dismiss. *Id.*, at 89. The plaintiff in *Febus-Rodriguez* had the benefit of discovery to learn of prior acts of misconduct and develop expert testimony and a theory of liability based on such prior acts, a fact not diminished simply because the court found the evidence for the theory lacking.

Second, *Febus-Rodriguez* involved an arrest, and it is well settled that the constitutional duties in dealing with the mentally ill or those in need of medical care are different during an arrest, as opposed to situations where no arrest is being made or after a person is taken into police custody. Plaintiff was not arrested nor was he being arrested when Trooper Walker began pepper-spraying him.

Third, the First Circuit's decision did not turn at all on whether or not the rights of mentally handicapped person not to be beaten by untrained officers were "clearly established" in 1990, when the beating took place. Indeed, the words "clearly established" do not appear in footnote 6's dicta, the language cited by the Defendant. *Id.*, at 93 n.6. Rather, the First Circuit based its decision on the fact that the plaintiff "failed to introduce sufficient evidence to create a triable issue that the police superintendent violated Febus' constitutional rights..." *Id.*, at 94.

Fourth, Defendant Alben omits the key language from footnote 6 suggesting that plaintiff's claim based on a failure to provide mental health training foundered for factual reasons, not legal reasons. The First Circuit began the footnote by stating: "We

are somewhat troubled by Betancourt's failure to provide officers with training about how to deal with mentally handicapped persons." *Id.*, at 93 n.6. The First Circuit then noted that the need to extensively train officers about how to identify and deal with mentally handicapped persons was not "so obvious, that failure to give this training supports a finding of reckless or callous indifference to constitutional rights," at least by 1994 standards. *Id.* But even assuming that the failure to give such training was callously or recklessly indifferent (which Plaintiff contends was the case by 2013), the First Circuit also noted that "the record is bereft of evidence that this failure was affirmatively linked to the assault." *Id.* Specifically, the court found "no evidence" that officers "improperly approached" the plaintiff, "or that their assault of him stemmed from the fact that they did not know how to deal with a mentally handicapped person." *Id.* But an improper approach and an ignorance of proper de-escalation techniques are the essential elements of Plaintiff's claims against Defendant Alben.

Plaintiff alleges that Trooper Walker received *no training* on "techniques to de-escalate confrontations and avoid the use of lethal force." (Compl., ¶ 59.) Instead, Trooper Walker was following his "traditional training," which resulted in "an escalation of force where the subject is uncooperative (or inattentive) to verbal commands, appears defiant or aggressive, reacts combatively to attempts to restrain or subdue, and is not rationally dissuaded by a demonstration of superior force." (Compl., ¶ 63.) Thus it is more than plausible that Trooper Walker's training was the cause of the Wilfredo Justiniano's death.

By 2012, every police department in the United States was aware of (or willfully blind to) the need for crisis intervention and enhanced policies and training for dealing with the mentally ill. In February 2012, more than a year-and-a-half before Wilfredo Justiniano was shot and killed, the Police Executive Research Forum held a summit on "An Integrated Approach to De-Escalation and Minimizing Use of Force." (Exhibit C.) The summit was held in Washington, D.C. and was attended by representatives of more than 100 police departments, including those of Cambridge, Brookline, and Haverhill. *Id.*, at 18, 19, 42. Various federal law enforcement officials, including those from the DOJ and FBI also attended. *Id.*, at 41–44. During the summit, discussions centered on the Crisis Intervention Team (CIT) model, where police departments team up with local mental health experts, advocates, and academics to design a comprehensive plan for police training and policies for managing individuals with mental illness, has generally been considered "successful." *Id.*, at 13. According to Ron Honberg, Director of Policy and Legal Affairs or the National Alliance on Mental Illness (NAMI), by 2012 more than 2,000 state and local police forces had implemented CIT. The Massachusetts State Police, obviously, was not one of them.

Later in 2012, the U.S. Justice Department's Civil Rights Division noted in its report on the constitutional deficiencies of Portland's policing of the mentally ill that "[t]he law recognizes that police response to persons in mental health crisis requires special consideration. When dealing with someone with a mental illness, officers must take into account the subject's mental and emotional state before using force." (Exhibit D, at 11.), citing *Deorle*, 272 F.3d at 1282. This is because "[t]he problems posed by, and thus the

tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." *Deorle*, 272 F.3d at 1282–83. Even "when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted . . . with a mentally ill individual." *Id.*, at 1283.

By June 2013, no police department in the country could claim that it was unaware of crisis intervention training or de-escalation techniques necessary to deal with the mentally. The unlawfulness of foregoing such techniques had become apparent. Thus Defendant Alben is not entitled to qualified immunity.

### C. There Are No Negligence Claims to Dismiss

Defendant Alben argues that Plaintiff seeks damages for Defendant Alben's negligence. This is simply not the case. The Massachusetts Wrongful Death Act, Mass. Gen. Laws ch. 229, § 2, is not limited to negligence, and allows an executor or administrator to recover damages for any "willful, wanton or reckless act causes the death of a person under such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted." In this action, Plaintiff has not brought claims under the Massachusetts Tort Claims Act. Rather, the Plaintiff exclusively brings civil rights claims, and such claims are not immunized by Mass. Gen. Laws ch. 258, § 2.

Respectfully submitted,

Dated: November 12, 2015

/s/ Ilyas J. Rona

Ilyas J. Rona (BBO# 642964)
Leonard E. Milligan (BBO# 668836)
Gregory N. Corbin (BBO# 687957)
MILLIGAN RONA DURAN & KING LLC
745 Atlantic Avenue, 8th Floor
Boston, Massachusetts 02111
Tel: (617) 395-9570
ijr@milliganrona.com
lem@milliganrona.com

*Attorneys for Plaintiff Damaris Justiniano, the Personal Representative of the Estate of Wilfredo Justiniano, Jr.*

CERTIFICATE OF SERVICE

I, Ilyas J. Rona, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first class mail to any non-registered participants.

Date: November 12, 2015

/s/ Ilyas J. Rona

Ilyas J. Rona