UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAMARIS JUSTINIANO, as the Personal Representative of the Estate Of WILFREDO JUSTINIANO JR.,     Plaintiff<br>v.<br><br>STEPHEN WALKER and TIMOTHY P. ALBEN,     Defendants | CIVIL ACTION NO.: 1:15-cv-11587-NMG |

**DEFENDANT STEPHEN WALKER'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Pursuant to L.R. 56.1, Defendant Stephen Walker hereby submits this Statement of Undisputed Material Facts in support of his Motion for Summary Judgment. The deposition transcripts and other documents referred to in this Statement of Facts (except the Complaint) are attached to the Affidavit of David J. Officer Submitting Documents In Opposition to Defendants' Motion for Summary Judgment.

1. Stephen Walker is a sworn law enforcement officer in the Massachusetts State Police, and all times relevant to this action he was acting in furtherance of his duties and was acting under color of law ("Walker"). **Complaint, ¶ 6.**

2. Walker graduated from the Metropolitan District Police Academy in 1988 ("MDC Academy"). **Walker Tr., p. 47, l. 5.** In 1992 he became a member of the Massachusetts State Police ("MSP") when the Metropolitan District Commission Police merged with the MSP. **Walker Tr., p. 78, l. 2-8.**

3.     During his training at the MDC Academy, Walker was trained in the use of force in his job as a police officer. His training included the different levels of force that can be used in subduing a subject and when it is appropriate to use each level of force. **Walker Tr., p. 52. L. 20-24; p. 53, l. 1-8.**

4.     The MSP has written policies regarding use of force by its officers. The policies were identified and made Exhibit 1 to the deposition of Stephen Walker. **Walker Tr. p. 129, l.21 – p. 130, l. 21.**

5.     The then-current MSP Use of Force Policy is read to or by MSP personnel each year when they recertify in use of firearms. **Walker Tr. p. 134, l. 1-9.**

6.     The use of force can include lethal force when circumstances warrant. **Walker Tr., p. 53, l. 12-14.**

7.     The Use of Force Policy authorizes members of the MSP to use that force which is "reasonable" to, among other things, "protect themselves or others from physical harm." **Exhibit 1 to Walker Deposition.**

8.     Under the Use of Force policy, determining the proper use of force requires consideration of factors including, among others, whether the suspect poses an immediate threat to the safety of the MSP member or others. **Exhibit 1 to Walker Deposition.**

9.     The Use of Force Policy also contains a contains a "Use of Force Continuum" that describes the subject's level of cooperation or "assaultiveness" and the appropriate response for the member. The continuum, from least force to greatest, includes Verbal Commands, Control Techniques, OC Spray, Striking Techniques, and Lethal Force.

10.    Under the Use of Force Policy, a trooper's use of force increases according to the subject's actions and behavior: greater resistance or assaultive behavior can be met with

increasing use of force, up to and including use of lethal force.  MSP members need not follow the "force continuum" in progression: if circumstances warrant, they can got from a lower level use of force to striking techniques, for example.  **Walker Tr., p. 53, l. 9-11 and Exhibit 1 to Walker Deposition.**

11.     Walker's training in lethal use of force by use of a firearm is to shoot at the center of mass of a subject.  "Center mass" presents a larger target that is less likely to be missed, reducing the chance of an errant bullet striking a bystander.   **Walker Tr. p. 53, l. 21 – p. 54, l.**

12**.**  Members of the MSP are not trained "to shoot someone in the kneecap" or to fire a disabling shot into a limb.  **Walker Tr., p. 53 l. 18-20.**

13.     Walker was also trained to shoot twice when withdrawing a firearm and firing it at a subject.  The firing of two shots in immediate succession is referred to as a "double-tap." **Walker Tr., p. 58, l. 2-18.**  An officer may fire as many rounds is reasonably necessary to stop the threat he or she is facing.  **Walker Tr., p. 62, l. 2-10.**

14.     On June 14, 2013 Walker was assigned to the day shift (7 AM- 3:30 PM) and was assigned to the MSP Milton barracks.  **Walker Tr. p. 178, l. 1 – 22.**

15.     Walker first learned of a situation occurring on Route 28 near Randolph at about 8 AM.  He was in the barracks, near the front desk at the station, when the desk officer informed him there was a possible medical emergency that a bystander had phoned in.  **Walker Tr. p. 185, l. 14 – p. 186, l. 10.**

16.     Walker informed the desk officer that he would respond to the call.  He left the barracks and headed to the scene of the emergency.  **Walker Tr. p. 187, l. 8 – 17.**

17.     When Walker arrived on scene, he was southbound.  He saw a white van parked in the northbound breakdown lane and, behind it, a small black or blue car.  He saw a man

3

standing in the roadway, yelling and jumping up and down.  He could not make out what the man was saying.[1]  **Walker Tr. p. 190, l. 6-19.**

18.     Mr. Justiniano was standing over the white line marking the road's breakdown lane, on travel lane side of the line.  **Walker Tr. p. 192, l. 2-3.**

19.     Trooper Walker drove past the small black vehicle and made a U-turn so that he was facing northbound and he drove up behind the two vehicles and parked on the side of the road.  **Walker Tr. p. 193, l. 14-19.**  His cruiser's emergency lights were still on and remained on for the duration of the incident that was to unfold.  **Walker Tr. p. 194, l. 6-10.**

20.     Prior to parking the cruiser, Walker had radioed dispatch that he was on scene at the location and he requested that another unit be dispatched to the scene because things at the scene "Just didn't feel right."  **Walker Tr. p. 194. L. 11-20.**

21.     Walker got out the cruiser to assess the situation.  **Walker Tr. p. 198, l. 10-14.**

22.     When he exited the cruiser, he had with him on his utility belt a firearm, pepper spray and his collapsible baton.  **Walker Tr. p. 202, l. 3-19**

23.     After he left the cruiser, he stood by his car and got Mr. Justiniano's attention. Mr. Justiniano "just looked at [him]."  Walker asked Mr. Justiniano "what was wrong, what was going on, something to that effect."  **Walker Tr. p. 203, l. 2-4.**

24.     Walker estimated that the distance between Mr. Justiniano and him was fourteen to twenty feet when he first engaged Mr. Justiniano.  **Walker Tr. p. 203, l. 5-10.**

25.     When Trooper Walker spoke to Mr. Justiniano, he responded to Walker by telling him that he (Mr. Justiniano) was "an undercover cop" and that Walker "was going to have to kill him."  Mr. Justiniano seemed angry.  **Walker Tr. p. 204, l. 1-6.**

---

[1] The man was the plaintiff's decent, Wilfredo Justiniano Jr., although Walker did not know his name at the time.  Rather than refer to him as "the man," he will be referred to as "Mr. Justinano."

26. Walker spoke to Mr. Justiniano. He told him "I'm not here to do that." Walker put his hands out with his palms facing Mr. Justiniano to gesture stop. He asked Mr. Justiniano "Why would I do that? I'm not here for that." With hands toward Mr. Justiniano signaling "Stop," Walker backed up "a little bit." **Walker Tr., p. 205, l. 7-24.**

27. As Walker surveyed the situation, he saw that Mr. Justiniano had in his hand a blue stick ballpoint pen and that he was holding it as one would hold a knife to stab something. **Walker Tr. p. 207, l. 10; p. 208, l. 18-19; and p. 209, l. 23- p. 210, l. 6.**

28. Mr. Justiniano was moving toward Trooper Walker. At this time, his gait was slow as he approached. He slowly advanced on Walker. **Walker Tr. p. 208, 12-13.**

29. As he approached Walker, Mr. Justiniano told Walker that if Walker didn't kill him, he would kill Walker. He repeated this throughout the incident. **Walker Tr. p. 209, l. 7-11; p. 213, l. 23 – p. 214, l. 2.**

30. In Walker's police training, he was taught that a standard ballpoint pen could be used as a weapon. **Walker Tr. p. 211, l. 6-10.**

31. When Mr. Justiniano told Trooper Walker that Walker would have to kill him, Mr. Justiniano started coming faster toward Walker. **Walker Tr. p. 212, l. 18 – p. 213, l. 7.**

32. Walker instructed Mr. Justiniano to drop the pen and to stop. **Walker Tr. p. 212, l. 22.**

33. Mr. Justiniano did not drop the pen and he continued his advance on Walker. He told Walker that Walker must kill him or he would kill Walker. **Walker Tr. p. 213, l. 17 – p. 214, l.2**

34. Walker removed the pepper spray from his utility belt. He felt threatened by Mr. Justiniano, who had threatened to kill him, was now accelerating his advance and was holding a pen as he would to use it as a weapon. **Walker Tr. p. 214, l. 7-11.**

35. Walker was still using verbal techniques to gain control of Mr. Justiniano. **Walker Tr. p. 214, l. 14.**

36. Trooper Walker and Mr. Justiniano were about fourteen feet apart. Mr. Justiniano continued his advance. Walker warned Mr. Justiniano that he would use the pepper spray and he sprayed Mr. Justiniano in the face with a burst of pepper spray. **Walker Tr. p. 212, l. 21; p. 214, l. 3 – p. 216, l. 13.**

37. The pepper spray had no effect on Mr. Justiniano. He wiped the pepper spray from his face with his hand and flung his hand toward the ground to get it off his hand. **Walker Tr. p. 216, l. 14 – p. 217, l. 3.**

38. During the incident, prior to shooting, Walker called again for back up. He radioed and "asked them to step it up." **Walker Tr. p. 222, l. 21 – p. 223, l. 2**

39. Mr. Justiniano continued his advance on Walker. Walker backed up to maintain distance between them. Walker warned Mr. Justiniano that he would spray him again with pepper spray. Mr. Justiniano continued his advance and picked up speed. Walker sprayed him again with pepper spray from a distance of about fourteen feet. **Walker Tr. p. 217, l. 10 - p. 218, l. 11.**

40. The second burst of pepper spray hit Mr. Justiniano in the face. Again, it did not seem to have any affect on him. The wind blew some of the aerosol pepper spray into Walker's face and eyes. Walker's vision was compromised. **Walker Tr. p. 220, l. 2-7.**

41.     Walker tried to clear the pepper spray from his face.  The next thing he knew, Mr. Justiniano was in a full run coming at him.  **Walker Tr. p. 223, l. 13 – 22.**  Mr. Justiniano ran toward Walker at full speed.  He looked very angry.  He yelled he was going to kill Walker.  He still had the pen in his hand.  **Walker Tr. p. 224, l. 20-22; p. 227, l. 1-14.**

42.     Walker saw that Mr. Justiniano still had the pen in his hand and had raised his hand to chest height, holding the pen in a stabbing position.  Mr. Justiniano was four to seven feet away from Walker and was running toward Walker.  **Walker Tr. p. 228, l. 1-9.**

43.     Walker withdrew his firearm from its holster.  He did not have time to raise the firearm up and point it.  He did not have time to issue a warning to Mr. Justiniano.  When the firearm had cleared the holster, he pointed it at Mr. Justiniano and he shot twice.   Shooting "from the hip" was part of Walker's police training.  Mr. Justiniano was about four feet away from Trooper Walker when Trooper Walker fired. **Walker Tr. p. 228, l. 20 – p. 229, l. 16; p. 230, l. 6.**

44.     Walker was in fear for his safety:  Mr. Justiniano "was coming at me screaming that he was going to kill me. Had the pen in his hand, and I was afraid for myself." **Walker Tr. p. 230, l. 8-10.**

45.     After he was shot, Mr. Justiniano stopped.  He was about four feet away from Walker.   Walker backed up.  He had his gun in the "low ready" position.[2]  Walker told Mr. Justiniano several times to get on the ground.  **Walker Tr. p. 230, l. 11 – p. 231, l. 2.**

---

[2]   "Low ready" is a position assumed by an armed officer in which he or she stands facing the target with the muzzle of the weapon pointed down from the target so the officer is not pointing at the target but is ready to do so if needed.  **Walker Tr. p. 92, l.21 – p. 93, l. 11.**

7

46. Mr. Justiniano went to his knees and then onto his back. **Walker Tr. p. 234, l. 18-20.** Walker radioed that shots had been fired and he needed help. **Walker Tr. p. 237, l. 13-20.**

47. Walker saw that Mr. Justiniano's breathing seemed labored. He approached him to check him in case he needed to start CPR or other first aid. When he reached down to check on him, Mr. Justiniano grabbed his arm and tried to grab his gun. He swung at Walker. Walker was able to break Mr. Justiniano's grip and moved away from him. **Walker Tr. p. 238, l. 2-13.**

48. Mr. Justiniano rolled over from his back to all fours, trying to get up. Walker repeatedly instructed him to say down. He kept trying to get up. Walker nudged Mr. Justiniano's backside with the ball of his foot so he would fall over to the ground. This occurred twice. **Walker Tr. p. 238, l.15 – p. 239, l. 19.**

49. Walker did not shoot or pepper spray Mr. Justiniano again, nor did he pull out his baton from his utility belt. **Walker Tr. p. 241, l. 1-17.**

50. Walker and another trooper who had arrived on scene attempted to handcuff Mr. Justiniano, who was resisting. Additional officers assisted and Mr. Justiniano was eventually handcuffed. **Walker Tr. p. 241, l18 – p. 242, l. 10.**

51. The first officer to arrive at the scene after shots were fired was Trooper Joseph Durning. When he arrived on scene, he saw Walker in the travel lane of the roadway and Mr. Justiniano partially in the travel lane. **Durning Tr. p. 84, l. 1-14; p. 86, l. 1 – 17.**

52. Durning attempted to handcuff Mr. Justiniano so he could render first aid. Troopers are trained to assure the scene is safe before rendering first aid. Durning put one handcuff on Mr. Justiniano and then Mr. Justiniano started resisting. Mr. Justiniano flailed his arm with the handcuff attached, swinging the handcuff. Mr. Justiniano was attempting to get up.

Durning was concerned that Mr. Justiniano might have a weapon. He pepper sprayed Mr. Justiniano. **Durning Tr., p. 99, l. 12 – p. 104, l. 15.**

53. After Durning had pepper sprayed him, Mr. Justiniano "just stared at [Durning] and continued to fight…" In his career, Durning has deployed pepper spray "once or twice," and in each instance it was quite effective. It did not have any effect on Mr. Justiniano. **Durning Tr., p.109, l. 1-18.**

54. Durning and Walker attempted to place Mr. Justiniano into custody by completing the handcuffing. They were unsuccessful. Other officers arrived and helped subdue Mr. Justiniano and he was eventually handcuffed. He was placed on a backboard and a stretcher when an ambulance arrived. **Durning Tr., p. 117, l. 22 – p. 118, l. 23.**

55. Durning saw a shell casing and a blue Bic round stick pen at the scene. **Durning Tr., p. 133, l. 23 – p. 135, l. 13**

56. On June 14, 2013 Karen Kyriakides ( "Kyriakides") was driving a white van headed north on Route 28 after having dropped her children off at school. **Kyriakides Tr. p. 21. L. 15 – p. 22, l.. 6.**

57. She observed a black car in front of her. The car was swerving from right to left across the road. The car was traveling slower than the speed limit. **Kyriakides Tr. p. 23, l. 16 – p. 24, l. 10.**

58. Kyriakides saw the black car swerve to the right, jump the curb, drive onto the road again and then park. She drove slowly by the car, looked in, and saw a man holding his right hand over his heart with his head tilted back. She pulled her van in front of the black car and parked. She walked back to the black car. The driver of the black car got out of his car as she approached. She asked the driver if he was okay and if he needed a doctor. He answered in a

9

language that she did not understand. He seemed distraught and confused. She told him to sit in his car and that she was going to call an ambulance and the police. The man got in his car and shut the door.[3] **Kyriakides Tr. p. 26, l. 22 – p. 19.**

59. Kyriakides returned to her van and called 911. She informed the person answering the call that there was a man who needed help and to send someone because she was concerned for his safety and the safety of others. **Kyriakides Tr. p. 30, l. 22 – p. 31, l. 3.**

60. As she was on the phone, Kyriakides looked in her car mirrors at Mr. Justiniano. She did so initially to be sure he got back into his car. She saw Mr. Justiniano throwing his arms and hands up in the air and tilting his head back. She stated that "he looked like he was speaking in tongue." (*sic*) **Kyriakides Tr. p. 31, l. 8 – p. 32, l. 21.**

61. After she made the 911 call, Kyriakides locked her doors and remained in the van. She remained in the van and locked her doors because she was fearful of Mr. Justiniano. She observed him pacing and walking around his car. **Kyriakides Tr. p. 31, l. 22 – p. 33, l. 14.**

62. As she waited for the police to arrive, Mr. Justiniano walked around his car with his arms in the air. Kyriakides became concerned because Mr. Justiniano walked to the edge of the breakdown lane and looked as if he might walk into the road. **Kyriakides Tr. p. 38, l. 13 – p. 39, l. 14.**

63. Kyriakides saw a state police cruiser arrive and park behind the black car. She was in the driver's seat of the van. **Kyriakides Tr. p. 41, l. 2-23**

64. She saw Walker get out of his vehicle and walk up to Mr. Justiniano, who was

---

[3] The man Kyriakides saw and interacted with was Wilfredo Justiniano Jr., although she did not know that at the time. Rather than refer to Mr. Justiniano as "the man," he will be referred to by name.

outside of his vehicle.[4] She saw Walker talking with Mr. Justiniano and saw that he was trying to calm him down. She didn't hear the conversation because her window was up. She saw Walker put his hands out with is palms face up, fingers pointing to the sky and moving his hands in a downward motion, as if to say "Calm down." **Kyriakides Tr. p. 44, l. 9 – p. 45, l. 22.**

65. Kyriakides took her eyes off her mirrors to look at her phone for "maybe three seconds". When she looked back in the mirror, she saw Mr. Justiniano and Walker had moved closer to the road. The next thing she saw was that Mr. Justiniano looked like he was ready to jump on Walker. **Kyriakides Tr. p. 56, l. 3 – p. 47, l. 9.**

66. She saw Mr. Justiniano "lunge at" Walker. Walker held up his hand, either to signal "Stop" or to use pepper spray. She saw Mr. Justiniano fall to the ground and then charge at Walker. **Kyriakides Tr. p. 49, l. 12 – p. 50, l. 11.**

67. She took her eyes away "maybe for a second" and heard gunshots. The last thing she saw before she heard gunshots was Mr. Justiniano trying to jump on Walker. She estimates that Mr. Justiniano was a foot from Walker when she last saw him before she heard gunshots. **Kyriakides Tr. p. 50, l. 17 – p. 51, l. 14.**

68. Exhibit 1 to Kyriakides' deposition is a memorandum from Sgt. Brian Brooks of the Norfolk District Attorney's Office to Detective Lieutenant Kevin Shea summarizing his interview of Ms. Kyriakides. Kyriakides gave the statement to Sgt. Brooks about ten minutes after the incident occurred. Her memory of the events was fresher when she gave the statement than when she was deposed. The statement accurately reflects what she told the state police on the day if the incident. **Kyriakides Tr. p. 19, l. 15 – p. 21, l. 7.**

---

[4] In her deposition, Kyriakides describes Trooper Walker as a white male. Walker is African American. There is no question that the trooper Kyriakides saw is Walker. While she did not know his name at the time, he shall be referred to as "Walker" rather than "the trooper."

69. Jo-Ann Silva-Winbush was an eyewitness to the incident involving Mr. Justiniano and Trooper Walker ("Silva"). Sgt. Brian Brooks interviewed Silva on June 17, 2013. Exhibit 1 to her deposition accurately depicts her statement to Sgt. Brooks, with one exception: the memorandum states that she "voluntarily returned to the Norfolk District Attorney's office" – Silva did not return voluntarily but because she was told she had to be there. **Silva Tr. p. 11, l. 11 – p. 12, l. 21.**

70. Silva was driving north on Route 28. Traffic slowed and she saw blue police lights. She was moving slowly by the location of the police vehicle and a black car that was in front of the police cruiser. She proceeded slowly when a police officer jumped backwards from in between the cruiser and the blue car. **Silva Tr. p. 29, l. 6 – 13; p.33, l. 5-22**

71. Silva saw a man, Mr. Justiniano, "running after the cop," Trooper Walker. She stopped her car. Walker put his hand up toward Mr. Justiniano to signal, "Stop." **Silva Tr. p. 31. L. 1; p. 35, l. 10 – 24.**

72. Mr. Justiniano appeared to be mad. Walker jumped back a second time. **Silva Tr. p. 36, l. 7 – 18.**

73. After the first time Walker jumped back, Silva saw Mr. Justiniano come after Walker with his hands up near his shoulders. Mr. Justiniano "lunged at" Walker. **Silva Tr. p.26, l. 22 – p. 37, l. 14.**

74. Walker put his left hand out with the palm facing Mr. Justiniano and fingers pointing up, to signal "Stop." **Silva Tr. p. 37, l. 22 – p. 38, l. 19.**

75. Walker pulled something from his waist or pocket. Mr. Justiniano was still coming at him. Walker sprayed Mr. Justiniano. **Silva Tr. p. 38, l. 20-23.**

76. Walker sprayed Mr. Justiniano in the face. The spray lasted a few seconds. Mr. Justiniano rubbed his face, shook his face and "then he got really mad at this point." **Silva Tr. p. 40, l. 2-20.**

77. Mr. Justiniano came after Walker with his fists. "He was ready to fight now. And the officer jumped back again. And now he was in – further in the street." **Silva Tr. p. 40, l. 21 – p. 41, l. 2.**

78. Mr. Justiniano came "raging at" Walker. He had his fists up to fight the officer. His fists were up and going toward the officer's face. Mr. Justiniano put his fists up and started running at Walker. Walker put his hand up again to signal "Back up" or "Stop." Walker was also moving backwards as he had his hand up for Mr. Justiniano to stop. **Silva Tr. p. 41, l. 13 – p. 44, l. 11.**

79. Mr. Justiniano was "mad." The distance between Mr. Justiniano and Walker was "about four feet" and Mr. Justiniano started to close the gap when he ran at Walker. Walker pulled his weapon, but Mr. Justiniano was "on him." "He already got on him. And that's when he shot him." **Silva Tr. p. 45, l. 1 – p. 46, l. 4.**

80. Silva saw Walker pepper spray Mr. Justiniano twice. Mr. Justiniano shook off each spray. After the second spray is when he came after Walker. When Walker reached for his gun, Mr. Justiniano was running at him. **Silva Tr. p. 46, l. 15 – p. 48, l. 23.** Mr. Justiniano was "very quick" in his attack on Walker. **Silva Tr. p. 48, l. 19.**

81. After he was shot and lying on the ground, Mr. Justiniano tried to grab Walker. Then another cop came up and Mr. Justiniano tried to grab him. Two officers came up and held down Mr. Justiniano, who continued to resist. **Silva Tr. p. 62, l. 24 – p. 65, l. 13.**

13

82. Silva saw Walker back up three times during the confrontation with Mr. Justiniano. She thought Walker was trying to avoid the confrontation. **Silva Tr. p. 71, l. 22 – p. 72, l. 4; p. 73, l. 1-6.**

83. Mr. Justiniano was transported by ambulance to Milton Hospital, where he died from gunshot wounds. **Complaint, ¶ 32.**

84. Mr. Justiniano had a long history of mental illness, including a diagnosis of paranoid schizophrenia. **Damaris Justiniano Tr.**, **p. , Exhibit 5.**

85. Mr. Justiniano had a history of non-compliance with his prescription regimen: he frequently did not take his prescribed medications. **Damaris Justiniano Tr.**, **p. 140, l. 24 – p. 141, l. 24 and Exhibit 5.**

85. Mr. Justiniano was hospitalized in March, April and May 2013 for forty-two days because of psychotic episodes. Among the symptoms he suffered were paranoia, auditory hallucinations and homicidal ideation. **Damaris Justiniano, Exhibits 5, 6 and 15.**

    Respectfully submitted
STEPHEN WALKER
By his counsel

/s/David J. Officer
David J. Officer/BBO#555253
David J. Officer, P.C.
PO Box 423
Southborough, MA 01772
Voice/fax: (888) 945-2333

February 15, 2018

CERTIFICATE OF SERVICE

    I, David J. Officer, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (ENF).

15

/s/ David J. Officer
David J. Officer