UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAMARIS JUSTINIANO, as the
Personal Representative of the
Estate of WILFREDO JUSTINIANO
Jr.,

        Plaintiff,

v.

STEPHEN WALKER and TIMOTHY P.
ALBEN,

        Defendants.

No. 15-CV-11587-DLC

## MEMORANDUM AND ORDER

CABELL, U.S.M.J.

    This case arises from a tragic and unfortunate incident. Massachusetts State Police Trooper Stephen Walker responded to a call and in the course of their encounter shot and killed Wilfredo Justiniano Jr. Damaris Justiniano has brought suit as the personal representative of Justiniano's estate, and the complaint presently alleges claims against Trooper Walker for excessive force and wrongful death. The defendant moves for summary judgment on both counts and the plaintiff opposes. (Dkt. No. 58, 73). After careful consideration of the record, the parties' submissions, and the information adduced at a hearing on the motion, the motion for

summary judgment will be <u>GRANTED</u>.  The reasons for this ruling are explained below.

   **I.   RELEVANT FACTS**

   On June 14, 2013, Karen Kyriakides ("Kyriakides") was driving on Route 28, a multilane state highway, when she observed the car in front of her drive erratically before coming to a stop on the side of the road.  (Defendant Stephen Walker's Statement of Undisputed Material Facts In Support of His Motion For Summary Judgment ("Defendant's SUF"), at ¶¶ 56-58).  When Kyriakides passed the vehicle she observed a man, later identified as Justiniano, holding his right hand over his heart with his head tilted back.  (Id., at ¶ 58).  Kyriakides approached the vehicle to check on him.  As she did so, Justiniano got out of his car and appeared distraught and confused.  (Id.).  Kyriakides asked Justiniano if he needed a doctor and "he answered in a language that [Kyriakides] did not understand."  (Id.).  Kyriakides instructed Justiniano to sit in his car while she went to call the police and for an ambulance.  (Id.).  Justiniano complied with her instructions.  (Id.).

   Kyriakides returned to her vehicle and dialed 911.  She informed the operator that there was a possible medical emergency and that she was concerned for the man's safety as well as the safety of others.  (Id., at ¶ 59).  While on the phone with the police, Kyriakides observed Justiniano outside of his vehicle

throwing his arms and hands up in the air and titling his head back. (Id., at ¶ 60). He appeared as though "he was speaking in tongues." (Id.). Kyriakides observed Justiniano pacing and walking around his car and thought he might walk into the travel lane of the road. (Id. ¶¶ 61-62).

Trooper Walker responded to the call. (Id., at ¶¶ 15-16). When he arrived on the scene he observed Justiniano standing in the roadway, yelling and jumping up and down. (Id., at ¶ 17). Before exiting his vehicle to assess the situation, Trooper Walker radioed dispatch that he was on the scene. He also requested that another unit be dispatched because "something di[d not] feel right." (Id., at ¶¶ 20-21).

Trooper Walker approached Justiniano and asked him "what was wrong, what was going on, [or] something to that effect." (Id., at ¶ 23). Justiniano, who was about 14 to 20 feet away, told Trooper Walker that he was "an undercover cop" and that Walker would have to kill him.[1] (Id., at ¶ 25). Unbeknownst to Trooper Walker at the time, Justiniano had a long history of mental illness

---

[1] The plaintiff disputes that these statements were made but bases the dispute on the fact that other witnesses testified that they could not hear what Walker and Justiniano said to each other. The court does not view that as a basis to question Trooper Walker's assertion. *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000)("[A plaintiff] cannot rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute."); *see also Chappell v. City of Cleveland*, 585 F.3d 901, 914 (6th Cir. 2009)(witnesses' failure to hear announcements did not refute testimony that such announcements were made and thus did not raise genuine dispute of fact).

3

which included a history of non-compliance with respect to taking his medication. (Id., at ¶ 84-85).

Kyriakides, still in her car, could not hear the conversation between Justiniano and Walker because her windows were closed. She did however observe Trooper Walker speaking to Justiniano and appearing to try and calm him down. (Id., at ¶ 64).

Justiniano slowly approached Trooper Walker and repeated that he (Walker) would have to kill Justiniano, and that if he did not, Justiniano would kill him. (Id., at ¶¶ 28-29). Trooper Walker gestured to Justiniano to stop advancing and he simultaneously backed up slightly to maintain the distance between them. (Id., at ¶ 26). Trooper Walker also observed that Justiniano was holding a blue stick ballpoint pen just as one would hold a knife. (Id., at ¶ 27).

Notwithstanding Trooper Walker's gesture that he stop, Justiniano began to pick up speed. Trooper Walker warned him to stop approaching and to drop the pen. (Id., at ¶¶ 31-32). Justiniano did not drop the pen and continued to walk towards Trooper Walker. (Id., at ¶¶ 31-33).

Jo-Ann Silva-Winbush ("Winbush") was in a car as she approached the two men and slowed down after observing police lights. She observed a police officer, presumably Trooper Walker, jump backwards in front of her car, in the travel lane of the

4

roadway. (Id., at ¶ 70). She then observed a man, presumably Justiniano, "running after the cop." (Id., at ¶ 71).

Kyriakides also saw Justiniano and Walker close to the roadway. She did not see a weapon but it looked to her as though Justiniano was ready to jump on Trooper Walker. (Id., at ¶ 65; Plaintiff's SUF, at ¶ 89).

Winbush observed Trooper Walker signal Justiniano to stop by putting his left hand out with his palm facing Justiniano. Justiniano continued to approach Trooper Walker and at the same time pulled something from his waist. (Defendant's SUF, at ¶¶ 74-75). Trooper Walker was about 14 feet away from Justiniano and warned him that he would use pepper spray if Justiniano continued to advance. (Id.).

According to Winbush, Justiniano moved towards Trooper Walker with his hands up near his shoulders and lunged at Trooper Walker. (Id., at ¶ 73). She observed that Trooper Walker then held up his hand to either signal Justiniano to stop or to use pepper spray. (Id., ¶¶ 73, 74). In fact, Trooper Walker emitted a short burst of pepper spray, which had no real effect on Justiniano. (Id., at ¶¶ 37, 76). Trooper Walker then jumped back again, further into the travel lane. (Id., at ¶ 72).

Justiniano rubbed his face after being sprayed and appeared angry. (Id.). Justiniano continued to advance towards Trooper Walker and Trooper Walker in turn backed up to maintain the

5

distance between them. Trooper Walker warned Justiniano that he would pepper spray him again if Justiniano continued to advance. This warning did not work and Justiniano continued to advance. Consequently, Trooper Walker used the pepper spray a second time. (Id., ¶¶ 37-39). This second use of the spray took place less than one minute after the first. (Defendant Stephen Walker's Supplemental Statement of Undisputed Material Facts in Support of His Motion for Summary Judgment (Defendant's Supp. SUF), at ¶ 106). Following the second burst, Trooper Walker radioed again for assistance. (Defendant's SUF, at ¶ 38).

Like the first burst, the second burst of pepper spray did not seem to have any effect on Justiniano. However, some of the spray blew back into Trooper Walker's face and compromised his vision. (Id., at ¶ 40). A witness observed that Justiniano appeared "ready to fight now" and Trooper Walker jumped back further into the travel lane of the roadway as he tried to clear the pepper spray from his face. (Id., at ¶¶ 41, 77).

Another witness stated that Justiniano then came "raging" at Walker with his fists up towards the Trooper's face. (Id., at ¶ 78). Yet another witness observed that Justiniano's fist was clenched and it appeared as though he might attack Trooper Walker. (Defendant Stephen Walker's Response to Additional Material Facts

6

Submitted By Plaintiff, ("Defendant's Response"), at ¶ 104.[2] For his part, Trooper Walker recalled that just prior to the shooting, Justiniano was running at him with a pen still in his hand, looking angry, and yelling that he was going to kill him. (Id., at ¶ 41).

According to Winbush, Trooper Walker pulled his weapon out as Justiniano was almost "on him." Trooper Walker did not have time to either fully extend his arm or warn Justiniano that he was going to shoot. (Id. at ¶¶ 45, 79). Instead, Trooper Walker pointed his firearm at Justiniano and shot twice from the hip, hitting Justiniano once in the left wrist and once in the chest. (Id., at ¶ 43).

Kyriakides did not observe the shooting but she did hear the gunshots. The last thing she saw before she heard the shots was Justiniano trying to jump on Trooper Walker from about a foot away. (Id., at ¶ 67).

Overall, the time interval between the second burst of pepper spray and the shooting was less than twenty seconds. (Defendant's Supp. SUF, at ¶ 106).

After being shot, Justiniano stopped about four feet away from Walker. (Defendant's SUF, at ¶ 45). Trooper Walker backed up and told Justiniano several times to get on the ground. (Id.).

---

[2] To be sure, witnesses to the shooting describe Justiniano's pre-shooting movements differently but none disagree that Justiniano aggressively approached Walker just prior to the shooting. (Defendant's Response, at ¶ 104).

Justiniano then went down to his knees and then onto his back as Trooper Walker radioed that shots had been fired. (Id., at ¶ 46). Trooper Walker then approached Justiniano. When he neared, Justiniano grabbed his arm and tried to swing at him. (Id., at ¶¶ 47, 81).

The first trooper on scene after the shooting observed Trooper Walker in the travel lane of the roadway and Justiniano partially in the travel lane. (Id., at ¶ 51). The trooper observed a shell casing and a blue Bic round stick pen at the scene. (Id., at ¶ 55). Winbush watched as another trooper came up to Justiniano and tried to place handcuffs on him as he lay on the ground. (Id., at ¶ 81). Justiniano tried to grab the trooper so two other troopers came to help. (Id.). Justiniano was eventually handcuffed and transported by ambulance to a local hospital, where he died from his wounds. (Id., at ¶¶ 81, 83).

## II.  LEGAL STANDARD

When the Court is presented with a motion for summary judgment, it shall grant it "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d

15, 19 (1st Cir. 2003). Once the moving party meets that burden, in order to avoid summary judgment, the opposing party must "show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (*quoting Ingram v. Brink's, Inc.*, 414 F.3d 222, 228-29 (1st Cir. 2005)). Indeed, the opposing party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (*quoting Triangle Trading Co. v. Robroy Indus. Inc*., 200 F.3d 1, 2 (1st Cir. 1999)).

When determining whether summary judgment is appropriate, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Id*. (*citing Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir. 2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted).

**III. DISCUSSION**

The complaint presently asserts two claims. Count I alleges under 42 U.S.C. § 1983 that Trooper Walker used excessive force against Justiniano, in violation of Justiniano's Fourth Amendment rights.

Count II ostensibly asserts two claims. It alleges a section 1983 claim for excessive force, in violation of Justiniano's Fourteenth Amendment rights, and also asserts a claim for wrongful death under the Massachusetts Wrongful Death Statute, M.G.L. ch. 229. The plaintiff agreed at a court hearing that Count II should be read as a practical matter to assert a single claim for wrongful death under chapter 229.

### A. <u>Count I- Fourth Amendment Excessive Force Claim</u>

Count I alleges under 42 U.S.C. § 1983 that Trooper Walker acted wantonly and recklessly and used excessive force when he fatally shot Justiniano. The defendant argues that he acted reasonably in context, and that he is entitled to qualified immunity even assuming he violated Justiniano's rights.

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). In order to prevail under section 1983, a plaintiff must show that the defendants (1) acted under "color of state law," and (2) deprived [the] plaintiff of a right secured by the Constitution

or the laws of the United States. *Budnick v. Baybanks, Inc.*, 921 F. Supp. 30, 32 (D. Mass. 1996). For purposes of this motion, there is no dispute that Trooper Walker was at all times acting under color of law. There is also no dispute that Justiniano, at the time of the shooting, was seized for purposes of the Fourth Amendment. *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *Stamps v. Town of Framingham*, No. 12-11908-FDS, 2014 U.S. Dist. LEXIS 177455 *9-10 (December 26, 2014).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A police officer's use of deadly force is deemed a seizure under the Fourth Amendment, and such an extreme action is reasonable only when "at a minimum, a suspect poses an immediate threat to police officers or civilians." *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 149 (1st Cir. 2003)(internal citations omitted). Whether the use of deadly force violated an individual's Fourth Amendment right is determined by considering whether the officer's conduct was "objectively reasonable." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

The shooting of a mentally ill man was unquestionably tragic, as such shootings always are, but tragedy does not equate with unreasonableness. The determination of reasonableness must make an allowance for the need of police officers to "make split second

judgments" in situations that are uncertain, tense, and evolving. *Berube v. Conley*, 506 F.3d 79, 83 (1st Cir. 2007). The intentional use of deadly force during a seizure is reasonable where an officer had probable cause to believe the victim posed a threat of serious physical harm or death. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). The incident must be viewed from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. The inquiry is objective, "without regard to [the officer's] underlying intent or motivation." *Id.* at 397.

Based on the record, the court finds that Trooper Walker acted reasonably and did not use excessive force in violation of Justiniano's Fourth Amendment rights. To begin, Trooper Walker had limited information as he arrived on scene. When he first observed Justiniano, he was behaving erratically and jumping up and down in or near a busy roadway, during the morning commute. When Trooper Walker initially approached Justiniano to assess the situation, Justiniano threatened to kill Trooper Walker if he did not kill Justiniano first. Witnesses confirmed that Trooper Walker attempted to calm Justiniano down through the use of verbal techniques and hand gestures, to no avail.

Tensions rose further when Justiniano continued to approach Trooper Walker and Walker in turn backed up into the travel lane of a busy roadway where motorists were still operating vehicles.

Despite repeated instructions to stop, Justiniano continued to approach Trooper Walker with a pen wielded in a threatening manner.[3]

Trooper Walker sought again to deescalate the situation. He warned Justiniano that he would use pepper spray if Justiniano continued to advance and did not drop the pen. Justiniano did not stop and Trooper Walker accordingly used the spray in an effort to stop his advancement. Unfortunately, it did not work and Justiniano in response approached more quickly with his hands raised, "ready to fight." Trooper Walker again used the pepper spray to retard Justiniano's advance but this time took some of the spray himself, which in turn impaired his ability to see.

Even then, the record reflects that Trooper Walker did not take action against Justiniano and instead radioed for back-up assistance. Witnesses saw Justiniano running at Trooper Walker, ready to "jump on him" from four feet away. It is at this point, with his vision was compromised, standing in the travel lane of a busy roadway, and with Justiniano rapidly approaching him

---

[3] The plaintiff contends that there is a dispute whether Justiniano had a pen where no other witness testified to seeing one. He argues that a pen is not a dangerous weapon in any event. However, the record reflects that a pen was found at the scene near to a shell casing, and no witness actually contradicted Trooper Walker's testimony by affirmatively stating that Justiniano did not hold a pen. The court does not view this discrepancy as presenting an issue of fact. And, assuming Justiniano did have a pen, it is clear that a pen can become a dangerous weapon if it is used in a way that makes it capable of causing serious harm. *U.S. v. Whindleton*, 797 F.3d 105, 114 (1st Cir. 2015).

apparently ready to fight, that Trooper Walker then removed his firearm and fired twice from the hip.

Against that backdrop, the court cannot find that Trooper Walker's use of force was unreasonable. Justiniano told Trooper Walker that he would kill him if Walker did not kill him first. He also failed to obey Trooper Walker's commands and warnings and continued to come towards him. This heightened the risk of danger because it signaled that Justiniano was non-compliant and because it forced Trooper Walker to back up into the path of traffic to maintain distance. Trooper Walker attempted to diffuse the situation by issuing more warnings and by calling for assistance, and shot Justiniano only after Justiniano suddenly closed the distance between the two men in a manner that strongly suggested he planned to attack Trooper Walker with a weapon. Under these circumstances, it was not objectively unreasonable for Trooper Walker to take the actions he took to ensure the safety of himself and others nearby. *Graham*, 490 U.S. at 396 (court must "judge [reasonableness] through the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"). Accordingly, despite the sad end to this encounter, the court finds that Trooper Walker's decision to shoot Wilfredo Justiniano was objectively reasonable and comported with the Fourth Amendment.[4]

---

[4] It bears noting that Trooper Walker's conduct comported with the Massachusetts State Police Use of Force Policy where he started with verbal

To be sure, the plaintiff argues that Trooper Walker should have known from Justiniano's erratic behavior that he was mentally ill. The plaintiff argues that, assuming that is the case, Trooper Walker's use of deadly force to respond to the situation was excessive and unjustified. In that regard, the First Circuit has observed that a heightened level of care and concern may need to be applied when evaluating the use of reasonable force in lethal force cases where the individual is suicidal or troubled, but that solicitude applies chiefly where the individual poses no real security risk to anyone other than themselves. *McKenny v. Mangino*, 873 F.3d 75, 82 (1st Cir. 2017). Here, Justiniano posed a genuine threat of harm to Trooper Walker and the situation moreover threatened to spill into oncoming traffic and create a danger to others. Under the circumstances, the court finds that Trooper Walker did not act unreasonably even assuming there was a basis to believe Justiniano had mental health issues. *See e.g., City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775 (2015)(officer justified in shooting mentally ill patient who had a knife and continued to advance within feet of the officer after pepper spray did not stop her). Similarly, the court finds no basis to fault Trooper Walker for acting without waiting for backup or first assessing whether a medical emergency existed. *See Scarpa*

---

techniques and only escalated to lethal force when Justiniano advanced upon him in the roadway in a threatening manner. (Defendant's SUF, at ¶¶ 3-11).

*v. Murphy*, 806 F.2d 326, 329 (1st Cir. 1986)(court will not second-guess officer's decision to not wait for backup assistance where to have done so could be construed as a shirking of their duty).

### B. <u>Qualified Immunity</u>

Even assuming *arguendo* that Trooper Walker's conduct amounted to a violation of Justiniano's Fourth Amendment rights, the court finds that he would be entitled to qualified immunity. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (*quoting Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In determining whether a defendant is entitled to qualified immunity, a court should consider: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation." *Ciolino v. Gikas*, 861 F.3d 296, 303 (1st Cir. 2017). The second prong has two components: "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." *Id*. While qualified immunity cannot protect Trooper

Walker from liability if, on an objective basis, no reasonably competent officer would have acted as he did, "if officers of reasonable competence could disagree on [the lawfulness of the alleged conduct], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Thus, the defense of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Id.* at 349.

Here, assuming *arguendo* that Trooper Walker used unreasonable force and that the right to be free from such force was clearly established at the time, the relevant inquiry for qualified immunity purposes is whether a reasonable, similarly situated officer would have understood Trooper Walker's conduct to violate Justiniano's rights. Viewing the facts in a light most favorable to the plaintiff, the court finds that a reasonable officer would not have clearly understood Trooper Walker's conduct to be unreasonable. Even accepting that one reasonably could wonder whether Justiniano was mentally troubled, a similarly situated officer would have concluded that Justiniano posed an imminent threat to Trooper Walker, to himself and to others, and would not have readily understood Trooper Walker's actions to violate Justiniano's rights. Among other things, the encounter took place on a busy roadway and Justiniano was already acting in an agitated state when Trooper Walker arrived on scene. Then, in short order, Justiniano threatened to kill Trooper Walker, failed to comply

17

with his commands, continued to advance towards him, positioned his arms and hands as if he intended to fight, and then charged at Trooper Walker. Further, interwoven among these acts, Trooper Walker employed verbal de-escalation techniques, backed away, used pepper spray and called for backup. The tragic way in which the encounter ended tempts one to engage in wishful hindsight but the record compels this court to conclude that no reasonable officer standing in Trooper Walker's position would have understood that shooting at Justiniano in that context clearly violated Justiniano's constitutional rights.

Accordingly, even assuming Justiniano's rights were violated, the violation was not obvious to a reasonable officer and qualified immunity therefore would shield Trooper Walker from liability. *See Holloman v. Markowski*, 661 Fed. Appx. 797, 801 (4th Cir. 2016)(officer entitled to qualified immunity after using deadly force on unarmed but physically resistant individual who had destroyed property and attacked police officers); *S.B. v. Cnty of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017)(officer entitled to qualified immunity after shooting mentally ill and intoxicated man who held a knife and failed to comply with officer's orders); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1029 (9th Cir. 2018)(officers entitled to qualified immunity for using deadly force on mentally ill and intoxicated man who charged officers with scissors raised).

Summary judgment therefore will be granted on Count I.

### C. <u>Count II- Statutory Wrongful Death Claim</u>

As noted above, Count II purports to allege a Fourteenth Amendment section 1983 claim for excessive force as well as a wrongful death claim pursuant to M.G.L. c. 229, § 2. Neither claim has merit here.

The Fourteenth Amendment section 1983 claim has no force because a claim of excessive force arising from a police encounter is analyzed under the Fourth Amendment, not the Fourteenth. *Graham,* 490 U.S. at 395 ("[a]ll claims that law enforcement officers have used excessive force-deadly or not- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness standard', rather than under a 'substantive due process' approach'.")

It is also not necessary to tarry long on Count II's wrongful death claim. Under M.G.L. c. 229, § 2, a person may be liable for the death of another if the death is caused by the person's negligence or a willful, wanton or reckless act. The plaintiff agreed at the hearing on the motion for summary judgment that his wrongful death claim is derivative of his excessive force claim in Count I, that is, it lives or dies depending on the outcome of Count I. In that vein, the plaintiff notes in his brief that Counts I and II both relate to "the constitutionality of the force

used." As the court has found in evaluating the excessive force claim in Count I that Trooper Walker did not use unreasonable force or violate the plaintiff's constitutional rights, that finding undermines the plaintiff's theory of liability underlying Count II. It follows that Count II fails and that Trooper Walker is entitled to summary judgment on count II.

**IV. <u>CONCLUSION</u>**

For the foregoing reasons, the Defendant's Motion for Summary Judgment (Dkt. No. 58) is GRANTED.

***<u>SO ORDERED.</u>***

<u>/s/ Donald L. Cabell</u>
DONALD L. CABELL, U.S.M.J.

DATED:   September 30, 2018